# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
| v. | Hon. James B. Clark, III |
| NICHOLAS BUCCIARELLI,<br>  a/k/a "Booch,"<br>ANTHONY D'ALESSANDRO,<br>  a/k/a "Fugit,"<br>NICHOLAS MARINO,<br>  a/k/a "Lefty" and<br>MICHAEL DORAZO,<br>  a/k/a "Cage" | Mag. No. 20-12328 |

I, Anthony Santorelli, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

_____
Anthony Santorelli
ATF Special Agent

Special Agent Anthony Santorelli attested to this Complaint by telephone pursuant to Federal Rule of Criminal Procedure 4.1(b)(2)(A) on August 31, 2020, in the District of New Jersey

Honorable James B. Clark, III
United States Magistrate Judge

_____
Signature of Judicial Officer

## ATTACHMENT A

### COUNT ONE
(Violent Crime in Aid of Racketeering – Assault with a Dangerous Weapon)

On or about August 19, 2020, in Gloucester County, in the District of New Jersey and elsewhere, the defendants,

**NICHOLAS BUCCIARELLI,**
a/k/a "Booch,"
**ANTHONY D'ALESSANDRO,**
a/k/a "Fugit," and
**NICHOLAS MARINO,**
a/k/a "Lefty,"

for the purpose of maintaining and increasing position in the Pagans Motorcycle Club, an enterprise engaged in racketeering activity, did knowingly and purposely assault Victim-1 with dangerous weapons, specifically, an axe handle and a firearm, contrary to N.J.S.A. 2C:12-1(b) and 2C:2-6, and did aid and abet the same.

In violation of Title 18, United States Code, Section 1959(a)(3), and Title 18, United States Code, Section 2.

## COUNT TWO
(Brandishing of a Firearm During a Crime of Violence)

On or about August 19, 2020, in Gloucester County, in the District of New Jersey and elsewhere, the defendants,

**NICHOLAS BUCCIARELLI,**
a/k/a "Booch,"
**ANTHONY D'ALESSANDRO,**
a/k/a "Fugit," and
**NICHOLAS MARINO,**
a/k/a "Lefty,"

during and in relation to a crime of violence for which each may be prosecuted in a court of the United States—specifically, the assault in aid of racketeering activity charged in Count One of this Complaint—did knowingly use and carry a firearm, which was brandished, and did aid and abet the same.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(ii), and Title 18, United States Code, Section 2.

## COUNT THREE
(Possession of a Firearm by a Convicted Felon)

In or around June 2020, in Camden County, in the District of New Jersey and elsewhere, the defendants,

**NICHOLAS BUCCIARELLI,**
a/k/a "Booch," and
**MICHAEL DORAZO,**
a/k/a "Cage,"

each knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate commerce four (4) firearms—namely one Ruger Red Hawk, .44 Magnum revolver, bearing serial number 501-18340; one Savage Arms, 69RXL, 12 Gauge "Weapon made from a shotgun," bearing serial number E244699; one Sig Sauer P320 .45 caliber pistol with no serial number present; and one Ruger, Mark II Target, .22 caliber pistol, bearing serial number 221-48377.

In violation of Title 18, United States Code, Section 922(g)(1).

## ATTACHMENT B

I, Anthony Santorelli, am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, videos, photographs, and other items of evidence. The information set forth herein contains information obtained from investigators and other law enforcement officers who have interviewed numerous witnesses and sources. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## The Enterprise

1. At all times relevant to this Complaint, defendants NICHOLAS BUCCIARELLI, a/k/a "Booch," ANTHONY D'ALESSANDRO, a/k/a "Fugit," JAMES MARINO, a/k/a "Lefty," MICHAEL DORAZO, a/k/a "Cage" and others known and unknown, were members of the Pagan's Motorcycle Club (the "Pagans" or the "Enterprise").

2. The Pagan's Motorcycle Club has been classified as an outlaw motorcycle gang by multiple law enforcement agencies. The Department of Justice has designated multiple outlaw motorcycle gangs, including the Pagans, as violent gangs. Members of the Pagans are known to engage in criminal activities such as violent crimes, weapons trafficking, and drug trafficking. The Pagans is an organization that maintains established membership chapters in numerous U.S. States and territories, including multiple active chapters in New Jersey.

3. The organization was established in the late 1950s, and continues to employ a hierarchal rank structure and formal by-laws. Each chapter has its own organizational structure. Each is managed by a President, a Vice President, a Sergeant at Arms, and a Secretary/Treasurer. On a national level, the Pagans report to a leadership council that is generally comprised of thirteen former chapter presidents known as the "Mother Club." The Pagans also appoint a national President, Vice President, Sergeant at Arms, and Secretary/Treasurer, all of whom are part of the Mother Club.

4. Members of the Pagans generally take orders only from their membership chapter's leadership figures, who in turn report to and take orders from the Mother Club. If a member of one chapter has a grievance against a member of another chapter, he is forbidden to act on it unless he has obtained permission from the leadership of the other chapter.

5. The Pagans, including its leaders, members and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the actions affected, interstate commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

6. At all times relevant to this Complaint, the Pagans, through its respective leaders, members, and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1)—namely, offenses involving the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under the laws of the United States, in violation of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances), Section 841 (distribution and possession with intent to distribute controlled substances), and Section 843(b) (use of a communication facility to violate the Controlled Substances Act).

## **Purposes of the Enterprise**

7. The purposes of the Enterprise included, but were not limited to, the following:

    a. Enriching the members and associates of the Enterprise through criminal activity, including drug trafficking;

    b. Promoting and enhancing the prestige, reputation, and position of the Enterprise with respect to rival criminal organizations;

    c. Preserving and protecting the power, reputation, territory, and criminal ventures of the Enterprise through the use of acts that involved intimidation, threats of violence, and acts of violence, including assault against, among others, members of rival organizations and members of the Pagans who violated the rules of the Enterprise;

    d. Keeping victims and rivals in fear of the Enterprise and its members and associates; and

    e. Concealing the activities of the Enterprise from law enforcement.

## Membership in the Enterprise

8. Defendant Nicholas BUCCIARELLI, a/k/a "Booch," is the Sergeant at Arms for the Camden County Chapter of the Pagans (the "Camden County Pagans") and a supplier of methamphetamine.

9. Defendant ANTHONY D'ALESSANDRO, a/k/a "Fugit," is the Sergeant at Arms for the Gloucester County Chapter of the Pagans (the "Gloucester County Pagans").

10. Defendant NICHOLAS MARINO, a/k/a "Lefty," is the President of the Gloucester County Pagans.

11. Defendant MICHAEL DORAZO, a/k/a "Cage," is a member of the Camden County Pagans and a supplier of methamphetamine.

## Means and Methods of the Enterprise

12. Among the means and methods by which the defendants and other members and associates of the Pagans conducted and participated in the conduct of the affairs of the Enterprise were the following:

   a. Members of the Pagans and their associates committed, attempted, and threatened to commit acts of violence, including assaults, to protect and expand the Enterprise's criminal operations;

   b. Participation in criminal activity by a member, particularly violent acts directed at rivals or as directed by the Pagans' leadership, increased the respect accorded to that member, and resulted in that member's maintaining and increasing status in the Enterprise;

   c. Members of the Pagans and their associates used and threatened to use physical violence against various individuals, including members of rival organizations;

   d. Members of the Enterprise and their associates trafficked methamphetamine and other controlled substances as a means of enriching themselves.

## The Seizure of Firearms Belonging to the Pagans

13. On or about July 23, 2020, an associate of the Gloucester County Pagans ("Victim-1") contacted law enforcement. Victim-1 stated that DORAZO had given Victim-1 six firearms and a large amount of ammunition over the

course of the preceding several weeks. DORAZO asked Victim-1 to store the firearms in his garage.

14. After speaking with Victim-1 on July 23, 2020, law enforcement drove to Victim-1's house, and Victim-1 permitted law enforcement to enter his garage and seize six firearms and ammunition. Specifically, law enforcement seized the following: One AR-15 style Privately Made Firearm ("PMF") with no serial number present; one Ruger Red Hawk, .44 Magnum revolver, bearing serial number 501-18340; one Savage Arms, 69RXL, 12 Gauge "Weapon made from a shotgun" bearing serial number E244699; one Sig-Sauer P320 .45 caliber pistol with no serial number present; one Ruger, Mark II Target, .22 caliber pistol bearing serial number 221-48377; and one Pen Gun with no serial number present (collectively, the "Pagans' Firearms"); and one thousand seven hundred and eighty-four (1,784) rounds of assorted caliber ammunition (the "Ammunition"). At least four of the Pagans' Firearms were manufactured outside the State of New Jersey.[1]

15. Later that evening, at the direction of law enforcement, Victim-1 called DORAZO. During that call, Victim-1 told DORAZO that he sold the Pagans' Firearms for five thousand dollars ($5,000). DORAZO asked Victim-1 if Victim-1 had the proceeds from the purported firearms transaction, and advised Victim-1 that Victim-1 had to make things right. DORAZO then directed Victim-1 to meet DORAZO at a location in Pennsylvania to pay DORAZO for the firearms transaction. Law enforcement then provided Victim-1 with a recording device and $5,000 in pre-recorded U.S. currency. Victim-1 then travelled to the meeting location, followed by law enforcement. As Victim-1 was driving, DORAZO called Victim-1 and changed the meeting location to another location in Pennsylvania. Shortly after arriving at the new meeting location, law enforcement observed DORAZO drive into the parking lot, get out of his vehicle and meet with Victim-1. According to Victim-1, he provided DORAZO the $5,000 in pre-marked currency during this meeting. DORAZO then got back into his vehicle and drove away.

16. On or about July 29, 2020, Victim-1 called law enforcement and stated that DORAZO had just arrived at Victim-1's residence unannounced. Victim-1 then used his cell phone's speaker phone function to allow law enforcement to surreptitiously monitor his interaction with DORAZO. DORAZO advised Victim-1 that the Pagans were angry when they learned that Victim-1 sold the Pagans' Firearms, and that Victim-1 had to pay the Pagans an additional $7,000.

17. DORAZO then told Victim-1 to call the person to whom he sold the Pagans' Firearms. Victim-1 then called an ATF Special Agent acting in an

---

[1] The ATF has not yet been able to determine the place of manufacture for the PMF or the Pen Gun.

undercover capacity ("UC-1"). UC-1 then spoke with DORAZO over the telephone. During that call, UC-1 told DORAZO that he had already sold the Pagans' Firearms and that there was no way to get them back. DORAZO and UC-1 then discussed the possibility of obtaining new firearms to replace the Pagans' Firearms. Victim-1 ultimately provided DORAZO with $4,000. DORAZO then left Victim-1's residence and drove away.

18. Victim-1 stated that DORAZO also gave him a one-gram sample of methamphetamine, which Victim-1 supplied to law enforcement. According to Victim-1, DORAZO deals methamphetamine for the Pagans, specifically, for BUCCIARELLI. Another confidential source has also informed law enforcement that both DORAZO and BUCCIARELLI distribute methamphetamine in and around Camden and Gloucester Counties.

### August 19, 2020 Retaliation

19. On or about August 19, 2020, D'ALESSANDRO called Victim-1 and stated that MARINO wanted to meet with Victim-1 the Clubhouse for the Gloucester County Pagans (the "Gloucester Pagans Clubhouse"), at 8:00 p.m. that evening. The Gloucester Pagans Clubhouse is a building located on the same property as D'ALESSANDRO's home.

20. That evening, Victim-1 drove to the Gloucester Pagans Clubhouse. Outside, he met MARINO and D'ALESSANDRO. D'ALESSANDRO told Victim-1 to leave his cell phone outside, and then used a handheld electronics detector on Victim-1 to ensure that he did not have any electronic devices. The three then went inside the Gloucester Pagans Clubhouse.

21. A short time later, BUCCIARELLI entered the Gloucester Pagans Clubhouse carrying an axe handle. He struck Victim-1 with the axe handle, leaving visible bruising on Victim-1's shoulder. BUCCIARELLI then drew a handgun from his waistband, racked the slide and pointed it at Victim-1's head. BUCCIARELLI then told Victim-1 that he was going to kill him, and yelled "Where are my f***ing guns? Where are my f***ing guns?"

22. Victim-1 then told BUCCIARELLI that he sold the firearms and gave the proceeds to DORAZO. BUCCIARELLI then told Victim-1 that he wanted to speak to the person who bought the firearms. BUCCIARELLI then left the Pagans Clubhouse to retrieve Victim-1's cell phone. While BUCCIARELLI was outside, D'ALESSANDRO and MARINO told Victim-1 that he was not permitted to leave the Gloucester Pagans Clubhouse until the issue was resolved.

23. BUCCIARELLI then returned with Victim-1's cell phone. BUCCIARELLI then told Victim-1 to call the person who purportedly bought the firearms. BUCCIARELLI specifically instructed Victim-1 that Victim-1 was only permitted to say what BUCCIARELLI instructed Victim-1 to say to the

purported buyer. BUCCIARELLI specified that if Victim-1 varied from the script or used any "code words" BUCCIARELLI would kill Victim-1.

24. Victim-1 then called UC-1. During that conversation, Victim-1 asked UC-1 details about the purported firearms transaction. UC-1, understanding that he was on speaker and that members of the Enterprise might be listening to their conversation, remained in his undercover persona throughout the conversation.

25. After concluding the call, BUCCIARELLI continued to interrogate Victim-1. BUCCIARELLI stated that Victim-1's version of the events differed from what BUCCIARELLI heard from DORAZO. BUCCIARELLI, MARINO, and D'ALESSANDRO ultimately permitted Victim-1 to leave the Gloucester Pagans Clubhouse. However, BUCCIARELLI told Victim-1 that they would discuss the unauthorized "sale" of the Pagan's Firearms again in a couple of days.

26. A review of BUCCIARELLI's criminal history reveals that prior to June 2020, he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year. Specifically, on May 3, 1996, he was convicted of Criminal Restraint, in violation of N.J.S.A. 2C:13-23A, and of Manufacture/Distribution of a Controlled Substance, in violation of N.J.S.A. 2C:35-5(b).

27. A review of DORAZO's criminal history reveals that prior to June 2020, he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year. Specifically, on March 23, 2016, he was convicted of Burglary, in violation of N.J.S.A. 2C:18-2A and on April 20, 2016 he was convicted of Possession of a Controlled Substance with Intent to Distribute, in violation of N.J.S.A. 2C:35-7.